UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MEYERS DIVISION

UNITED STATES OF AMERICA, <u>ex</u> <u>rel</u>.
BEVERLY SHIRLEY,

          Plaintiffs,

    vs.

BRONSON MEDICAL, LLC; NOVA
HEALTH PARTNERS, LLC d/b/a HEALTH
BENEFITS GROUP; CLINICAL LAB
SOLUTIONS, LLC d/b/a MYTEST
DIAGNOSTICS,

          Defendants.

Case No. 2:19.cv.596.7tm.38mRm

COMPLAINT FOR VIOLATION OF
FEDERAL FALSE CLAIMS ACT

**FILED IN CAMERA AND UNDER SEAL
PURSUANT TO 31 U.S.C. §3730(b)(2)**

**JURY TRIAL DEMANDED**

FILED

2019 AUG 27 PM 1:28

CLERK DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS FLORIDA



## COMPLAINT

Pursuant to the *qui tam* provisions of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*, (the "False Claims Act" or the "FCA"), *qui tam* Plaintiff-Relator Beverly Shirley ("Relator"), on behalf of the United States of America files this Complaint against Bronson Medical, LLC ("Bronson Medical"), Nova Health Partners, LLC d/b/a Health Benefits Group ("Nova Health"), Clinical Lab Solutions, LLC d/b/a MyTest Diagnostics ("MyTest"), (collectively "Defendants") and alleges:

## I.    INTRODUCTION

1.      This lawsuit involves a conspiracy by Defendants to deceive Medicare into paying for unnecessary and expensive cancer-related genetic tests. Defendants target the elderly to generate lab samples and reap illicit profits.

2.      Defendant Nova Health initiates the scheme through a cold-call to Medicare beneficiaries, convincing patients to submit their DNA for "free" hereditary cancer risk testing. Nova Health claims, on these calls, that such tests are covered by Medicare, and that a beneficiary "qualifies" for the free test by having either a personal history of cancer or two close family members who were diagnosed with the disease.

3.      These cancer genomic tests – or CGx tests – identify inherited genetic mutations. They can therefore help some people identify if they are at higher risk for inherited cancers. For patients that have active cancer diagnoses, CGx tests can help find better drug matches, based on the patients' particular genetic mutations. These tests are also known as "molecular pathology" tests.

4.      CGx tests do not, and cannot, diagnose cancer. Accordingly – despite Defendant's promises – Medicare does not actually cover such tests based on family history of cancer alone.

1

Medicare coverage actually *explicitly excludes* the hereditary risk testing Defendants advertise – *e.g.* tests to just help determine future risk of cancer.

5.      Despite this clear prohibition, Defendants inform beneficiaries they "qualify" for the free risk screening based on family history. For beneficiaries that "qualify," Defendant Nova Health initiates a lab requisition form to order the genetic tests. A telemedicine physician employed by Defendant Bronson then signs the lab orders, certifying them as medically necessary. This Bronson telemedicine doctor never speaks to, or treats, the beneficiary outside of a brief phone call.

6.      Medicare does not cover lab tests when they are not ordered by the patient's treating physician. Medicare defines a treating physician as "the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of a patient's specific medical problem." 42 C.F.R. § 410.32(a).  A telemedicine doctor, who neither treats the patient before or after the test, and never sees the patient, is not a treating physician and may not order tests that are billed to Medicare.

7.      Defendant Bronson nevertheless sends the patients' genetic samples and this lab requisition – ordered by someone who is not the patients' "treating physician" – to Defendant MyTest, a clinical laboratory, which references out the samples to a genetics lab to be tested. MyTest then bills Medicare for the CGx tests.

8.      To illegally maximize profits, Defendants provide false diagnosis on the lab requisitions and to Medicare. As described below, Relator Beverley Shirley was contacted by Defendants, and agreed to genetic testing. Relator later learned that Defendants had claimed to Medicare that she had cancer, when she had never had cancer nor mentioned having cancer.

2

9.     On the basis of these falsehoods, Defendants receive substantial reimbursements from Medicare. For Relator's sample alone, Defendant MyTest received thousands of dollars from Medicare for "molecular pathology" genetic testing – testing which is designed to help cancer patients find better treatment, and is not covered for patients without cancer.

10.     Relator Beverly Shirley discovered this scheme as a Medicare beneficiary targeted by Defendants.

11.     In March 2019, Relator was contacted by Defendant Nova Health's telemarketers and promised a "free" hereditary screening test. Relator specifically told them she has never been diagnosed with cancer nor had any symptoms, but noted she had a family history of cancer. Relator nevertheless was told she qualified for the test, and it would be covered by Medicare.

12.     After Relator agreed to receive the CGx tests, she was directed to speak to a telemedicine physician from Defendant Bronson. The Bronson healthcare provider never asked for, nor had access to, Relator's medical records, and never saw Relator in person. Indeed, the Bronson provider ordering the CGx tests only spoke once with Relator.

13.     After ordering the tests, Relator was rewarded with $20 in Walmart gift cards from Defendant Nova Health.

14.     After receiving her Medicare Explanation of Benefits – but before receiving any test result information from Defendants – Relator called a helpline number provided to testing patients, and asked for her results.  After consulting with a superior, a woman on the line told Relator that she would send the "diagnosis."

15.     A short time later, Relator received results in the mail, indicating no clinically significant genetic mutations. Relator had no opportunity to speak to a physician or medical professional regarding the results.

3

16.     For CGx tests run on Relator's sample alone, Defendant MyTest received over $4,000 in approved reimbursements for Medicare, and attempted to bill Medicare for over $20,000 in additional claims. Over the following months, Relator's Medicare Administrative Contract – First Coast – rejected a number of Defendant MyTests' appeals for additional reimbursement.

17.     Through Relator's insurance documentation, Relator learned that to justify the CGx tests as "medically necessary," Defendants had falsely represented to Medicare that she had cancer, despite knowing that Relator did not, and has never had, cancer. Specifically, in documentation related to Defendant's appeals, First Coast noted that "the documentation received indicates the molecular pathology testing was performed for the patient's condition of Non-Hodgkin lymphoma, unspecified (C85.90) family history other malignant neoplasms of lymphoid, hematopoietic and related tissues (Z80.7), Malignant melanoma of skin, unspecified (C43.9) and Family history of malignant neoplasm of other organs or systems (Z80.8)." Relator also received her MyTest "Cancer Genetics Requisition Form," which included these same false diagnosis codes for ordering the tests, and a Bronson "Insurance Verification Document."

18.     Relator never spoke to a physician or other medical provider, and never received any medical consultation regarding her test results.

19.     On information and belief, Relator was only one of many beneficiaries contacted in Defendant's profitable scheme to target the elderly and defraud Medicare.

20.     Relator, through her daughter, reported her concerns regarding Defendants' conduct to the U.S. Department of Health & Human Services' Office of the Inspector General (HHS-OIG). Relator's OIG tip was confirmed on May 4, 2019.

4

21.     *Qui tam* Relator Beverly Shirley seeks, through this action, to recover all available damages, civil penalties, and other relief arising from the false or fraudulent records, statements and/or claims that Defendants knowingly made or caused to be made in connection with its fraudulent scheme.

## II.    PARTIES

22.     Relator Beverly Shirley ("Relator"), a resident of St. Louis, Missouri, is a Medicare beneficiary who received an unsolicited phone call from Defendants offering a free hereditary genetic screening test, and ultimately submitted her DNA for testing.

23.     Defendant Bronson Medical, LLC ("Bronson"), a Delaware limited liability company registered as a foreign company in Utah, is a telemedicine company located at 420 W 1500 S, Suite 201, Bountiful, UT 84010.  Andrew McCubbins ("McCubbins") is a resident of Utah and owns, operates, and/or controls Defendant Bronson Medical.

24.     Defendant Nova Health Partners, LLC d/b/a Health Benefits Group ("Nova Health"), a Delaware limited liability company registered as a foreign company in Utah, is a telemarketing company located at 11399 S 700 E, Sandy, UT 84070.   Jordan Bunnell ("Bunnell") is a resident of Utah and owns, operates, and/or controls Defendant Nova.

25.     Defendant Clinical Lab Solutions, LLC d/b/a MyTest Diagnostics ("MyTest"), a Florida limited liability company, is a clinical laboratory located at 9671 Gladiolus Drive, Suite 102, Fort Myers, FL 33908. Sabine Mueller ("Mueller") is a resident of Florida and owns, operates, and/or controls MyTest.

## III.   JURISDICTION AND VENUE

26.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

27.   This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732, which authorizes nationwide service of process.  Moreover, Defendants can be found, reside in, or have transacted the business that is the subject matter of this lawsuit in this District.

28.   Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants can be found, reside in, or have transacted the business that is the subject matter of this lawsuit in this District.

29.   Although it is no a longer jurisdictional bar, the public disclosure provision of the federal False Claims Act is not implicated in this suit.  The Relator's Complaint is not based upon allegations or transactions of fraud that have been publically disclosed within the meaning of the False Claims Act.  Even if the allegations or transactions of fraud had been publicly disclosed, the Relator is an original source of the information within the meaning of the FCA. Her information is based upon her personal observations, independent of any relevant public disclosure, and materially adds to any information that could have been publicly disclosed.

## IV.   APPLICABLE LAW

### A.   The False Claims Act

30.   The FCA was enacted during the Civil War, and was substantially amended in 1986, and 2009.  Congress amended the Act in 1986 to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the Act, which Congress characterized as a primary tool

6

for combating government fraud, was in need of modernization. The amendments create incentives for individuals to come forward with information about fraud against the government without fear of reprisals or Government inaction, and enable the use of private legal resources to prosecute fraud claims on the Government's behalf.

31.    The federal False Claims Act (the "FCA") was originally enacted during the Civil War. After finding that fraud in federal programs was pervasive and that the FCA, which Congress characterized as the primary tool for combating government fraud, was in need of modernization, Congress substantially amended the FCA in 1986 to enhance the ability of the United States Government to recover losses sustained as a result of fraud against it. Congress intended that the 1986 amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf. Congress further substantially amended the FCA in 2009 and 2010 to, among other things, strengthen whistleblowers' ability to bring and maintain actions on the Government's behalf.

32.    The FCA prohibits, *inter alia*: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; and (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim. 31 U.S.C. §§ 3729(a)(1)(A)-(B). Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the amount of the damages sustained by the United States. 31 U.S.C. §3729(a)(1).

33.    For purposes of the FCA, a person "knows" a claim is false if that person: "(i) has actual knowledge of [the falsity of] the information; (ii) acts in deliberate ignorance of the truth

7

or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). The FCA does not require proof that the Defendant specifically intended to commit fraud. *Id.* Unless otherwise indicated, whenever the word "know" and similar words indicating knowledge are used in this Complaint, they mean knowledge as defined in the FCA.

34.     The federal Anti-Kickback Statute prohibits paying remuneration to a healthcare provider to influence the purchase of goods or services paid for by federal healthcare.   A violation of the federal AKS also violates the False Claims Act if federal reimbursement for any procedure that was obtained by the payment of a kickback is sought. 42 U.S.C. § 1320a-7b(g).

35.     Additionally, it is a violation of federal law to submit claims to a federal health care program for services that were medically unnecessary. Any claims submitted by Defendants or others for tests that were not ordered by the treating physician or for patients with a personal history of cancer or were otherwise not medically necessary are false and/or fraudulent claims within the meaning of the FCA.

**B.     The Anti-Kickback Statute**

36.     The federal health care Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), prohibits any person or entity from making or accepting payments to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a federally-funded health care program. 42 U.S.C. § 1320a-7b(b). The statute prohibits laboratories from offering or paying any remuneration, in cash or kind, directly or indirectly, to induce or influence orders or recommendations for laboratory services that may be paid for by federal health care programs. The AKS has been interpreted to cover any arrangement where *one* purpose of the remuneration was to obtain money for the referral of

8

services or to induce further referrals. *United States v. Kats*, 871 F.2d 105 (9th Cir. 1989);

*United States v. Greber*, 760 F.2d 68 (3d Cir.), *cert denied*, 474 U.S. 998 (1985).

37.    Compliance with the AKS is a precondition to both participation as a health care

provider in and payment under Medicaid, Medicare, CHAMPUS/TRICARE, CHAMPVA,

Federal Employee Health Benefit Program, and other federal health care programs.

38.    For example, to establish eligibility and seek reimbursement from the Medicare

Program, independent laboratories and other providers must enter into Provider Agreements with

CMS. As part of that agreement, the provider must sign the following certification statement:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to
> [me]. The Medicare laws, regulations and program instructions are available through the
> Medicare contractor. I understand that payment of a claim by Medicare is conditioned
> upon the claim and the underlying transaction complying with such laws, regulations, and
> program instructions (including, but not limited to, the Federal anti-kickback statute and
> the Stark law), and on the [laboratory's] compliance with all applicable conditions of
> participation in Medicare.

39.    Compliance with the anti-kickback provisions of the participation agreements is

material to the Government's decision to reimburse provider services. To receive payment,

providers participating in federal health care programs must expressly certify, in a provider

agreement or on claim forms, that they have complied with the applicable federal rules and

regulations, including specifically the AKS.

40.    Any party convicted of violating the AKS must be excluded from participating in

federal health care programs for at least five years. 42 U.S.C. § 1320a-7(a)(1). Even without a

conviction, the Secretary of the Department of Health and Human Services ("HHS") may

administratively exclude providers found to have violated the AKS from participating in federal

health care programs for a discretionary period (in which event the Secretary must direct the

relevant State agency to also exclude the provider). HHS also may impose administrative sanctions of $50,000 per violation. 42 U.S.C. § 1320a-7(b).

41.     Federal anti-kickback provisions demonstrate Congress's commitment to the principle that federal health care programs should not be influenced by financial inducements. Thus, compliance with the AKS is a prerequisite to a provider's right to receive or retain reimbursement payments from Medicare, Medicaid, and other federal and state health care programs.

42.     Furthermore, pursuant to the Affordable Care Act, any claim for reimbursement submitted to a federal health care program "that includes items or services <u>resulting from</u> a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g) (emphasis added). Courts have interpreted this language broadly. *See, e.g., U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 41 F. Supp. 3d 323, 333 (S.D.N.Y. 2014) (describing Congress's intent that the AKS should render kickback-tainted claims 'false or fraudulent,' even when submitted by an innocent third-party).

### C.     <u>The Medicare Program</u>

43.     Medicare is a federally-funded health insurance program which provides for certain medical expenses for persons who are over 65, who are disabled, or who suffer from End Stage Renal Disease. HHS and the Centers for Medicare and Medicaid Services ("CMS"), an agency within HHS, direct and manage the Medicare program.

44.     Medicare has four parts: Part A, providing hospital insurance; Part B, providing medical insurance, Part C, which includes managed care plans; and Part D, which provides prescription drug benefits. Medicare Part B includes reimbursement for covered out-patient laboratory tests performed by third parties when the tests are medically necessary.

45.     In order to administer Part B and provide payment to medical service providers in various geographical areas, the federal government contracts with private companies. These entities are known as Medicare Administrative Contractors or "MACs." MACs are tasked with processing Medicare claims, determining coverage for patients, and reimbursing physicians from the Medicare Trust fund. Out-patient laboratory testing claims are handled as part of this process.

46.     Typically, each type of laboratory test correlates to a CPT billing code. When a laboratory provider performs a test, the provider chooses the CPT code that fits the test and submits this code to the MAC. The selected CPT code determines how much the MAC will reimburse for that particular type of test. Laboratory testing providers bill their MACs directly from the location where the test was performed. Medicare Claims Processing Manual [Pub. 100-4] Chapter 16, Section 10.

47.     The designated MAC for Defendant MyTest is First Coast Service Options, Inc. ("First Coast"). First Coast is the MAC for the consolidated Medicare jurisdiction JN, which includes Florida, Puerto Rico, and the U.S. Virgin Islands.

*1.     Medicare Does Not Cover CGx Testing for Asymptomatic Patients with No Personal History of Cancer.*

48.     By statute, Medicare typically covers only health care services that are medically necessary to <u>diagnose or treat an illness or injury</u>. 42 U.S.C. § 1395y (emphasis added); *see also* 42 C.F.R. § 411.15(a)(1). Screening tests, including laboratory tests, are not covered unless expressly authorized by statute or regulation: "[Laboratory t]ests that are performed in the absence of signs, symptoms, complaints, personal history of disease, or injury are not covered except when there is a statutory provision that explicitly covers tests for screening as described."

11

Medicare Claims Processing Manual: Chapter 16—Laboratory Services ("Processing Manual") Section 120.1 (2018).

49.     Decisions about which specific services, procedures, or tests rendered by third-party payers are reimbursed, or "covered," by Medicare, are made either locally or at the national level. A national coverage determination (NCD) is binding on all MACs and Medicare carriers. In the absence of a national coverage determination, local coverage determinations (LCDs) fill the gap. The vast majority of coverage determinations happen at the local level, particularly for new medical technologies such as cancer genomic (CGx) testing. Local level decisions are typically made by fiscal intermediaries, MACs, or durable medical equipment regional carriers. Local or regional determinations are binding only upon those providers that contract with Medicare through the MAC that issued the determination.

50.     In accordance with Medicare statutes, First Coast requires that CGx testing be performed only for patients with a personal history of cancer. First Coast also required that the "[r]esults of the testing must directly impact treatment or management of the beneficiary," and, in the case of a multi-gene panel, testing is covered "ONLY for the number of genes or test that are reasonable and necessary to establish a diagnosis." Molecular Pathology Procedures (L34519).

51.     The personal history requirement is repeated in the First Coast LCD covering Lynch syndrome (*a.k.a* hereditary nonpolyposis colorectal cancer, or HNPCC): "Coverage of molecular testing for [Lynch syndrome] for carrier status or family studies is considered screening and is statutorily excluded from coverage." First Coast Service Options, Inc., Local Coverage Determination, Genetic Testing for Lynch syndrome (L345912). First Coast used this LCD to evaluate MyTest's claims for reimbursement related to Relator's CGx test.

12

52.     First Coast explicitly notes that "<u>screening services such as pre-symptomatic</u>
<u>genetic tests and services used to detect an undiagnosed disease or disease predisposition are not</u>
<u>a benefit and are not covered.</u>" First Coast Service Options, Inc., Local Coverage Determination,
Molecular Pathology Procedures (L34519) (Jan. 1, 2019); CMS, Decision Memorandum on
Diagnostic Laboratory Tests using Next Generation Sequencing (NGS) for Medicare
Beneficiaries with Advanced Cancer (Mar. 16, 2018) (testing of Medicare beneficiary who has
no signs or symptoms of illness or disease and has not been diagnosed with cancer, but has
family history of cancer, would be considered screening).

53.     CGx testing therefore cannot be covered under Medicare when used for screening
hereditary cancer risk, contrary to Defendants' representation to Medicare patients.

2.     <u>*Diagnostic Laboratory Tests Must Be Ordered by a Treating Physician*</u>

54.     Tests that are "not ordered by the physician who is treating the beneficiary are not
reasonable and necessary." 42 C.F.R. § 410.32(a). To receive Medicare reimbursement,
"diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is
treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary
for a specific medical problem and who uses the results in the management of the beneficiary's
specific medical problem." *Id.*

55.     When promulgating 42 C.F.R. § 410.32, HHS explained that the policy that
diagnostic tests must be ordered by the treating physician "is designed to assure that beneficiaries
receive medically necessary services and to prevent patterns of abuse, such as the furnishing of
diagnostic tests that are screening (noncovered) services rather than medically necessary services
for the diagnosis of the individual patient's condition." 61 Fed. Reg. 59490, 59497 (Nov. 22,

1996). HHS emphasized that this requirement "is fundamental for coverage and payment of diagnostic tests." *Id.*

56.    In its comments, HHS offered specific examples of situations in which a medical provider would not be considered a "treating physician," such as a physician who "is employed for the sole purpose of ordering diagnostic tests (in nursing homes or mobile centers)" or a medical director of a nursing facility who orders screening diagnostic testing for many patients in the facility. *Id.* HHS also included in this prohibition "the questionable testing offered to beneficiaries in public areas such as shopping malls." *Id.*

3.    *Laboratories Must Certify That Testing Is Medically Necessary and That They Will Abide By Medicare Laws*

57.    Before reimbursing a laboratory for tests, Medicare requires at least two certifications.

58.    Initially, in order to enroll as a Medicare provider, clinical laboratories must complete Form CMS-855B. This form requires applicants to certify that they will "abide by the Medicare laws, regulations and program instructions," and to certify their understanding that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the AKS), and on the supplier's compliance with the applicable conditions of participation in Medicare.

59.    By submitting CMS-855B, clinical laboratories certify that they are eligible for participation in the Medicare Program, and that they have complied with all applicable regulations and laws governing the program.

60.    Additionally, as a condition of Medicare payment, a physician or other Medicare-qualified clinical personnel must certify that the laboratory testing performed is medically

14

necessary and reasonable for the diagnosis and treatment of the patient. 42 U.S.C. §

1395n(a)(2)(B); 42 C.F.R. § 424.10(a). The physician, nurse practitioner, clinical nurse

specialist, or physician signing the certification must have knowledge of the case. 42 C.F.R.

§ 424.24(g)(2).

### 4.    *Laboratories Must Provide Documentation to Support Medical Necessity*

61.    Medicare requires that the laboratory that submits a claim keep and maintain

documentation that it obtained from the ordering physician, indicating that the treatment was

necessary and responsive to the patient's particular diagnosis or medical issue. 42 C.F.R. §

410.32(d)(2)(ii); *see also* Molecular Pathology Procedures (L34519) ("the medical record must

contain documentation that the testing is expected to influence treatment of the condition toward

which the testing is directed").

62.    The OIG's Compliance Program Guidance for Clinical Laboratories advises that

"laboratories should encourage physicians or other authorized individuals to submit diagnosis

information for all tests ordered, as documentation of the medical necessity of the service. The

form should contain a statement indicating that Medicare generally does not cover routine

screening tests." 63 Fed. Reg. 45076, 45079 (Aug. 24, 1998).

63.    "Examples of documentation requirements of the ordering physician/ non-

physician practitioner (NPP) include, but are not limited to, history and physical or exam

findings that support the decision making, problems/diagnoses, relevant data (e.g., lab testing,

imaging results)." First Coast Service Options, Inc., LCD, Molecular Pathology Procedures

(L34519).

64.    CMS will deny a claim where the laboratory's documentation does not

demonstrate that the service provided was reasonable and necessary. 42 C.F.R.

15

§ 410.32(d)(3)(ii); *see also* First Coast Service Options, Inc., LCD, Molecular Pathology Procedures (L34519) ("When the documentation does not meet the criteria for the service rendered or the documentation does not establish the medical necessity for the services, such services will be denied as not reasonable and necessary under Section 1862(a)(1)(A) of the Social Security Act.").

65.     HHS has noted that "all entities that bill the Medicare program are held liable when they bill for services and are not able to produce documentation of the medical necessity of the service." 66 Fed. Reg. 58788, 58801 (Nov. 23, 2001). This includes laboratories: "the law does not provide the authority to exempt laboratories from the provision related to medical necessity." *Id.*

## V.   **Allegations**

66.     This lawsuit concerns a conspiracy between a telemarketing company (Nova Health), a telemedicine company (Bronson), and clinical lab (MyTest) to submit false claims for hereditary cancer screening tests to Medicare.

67.     Broadly, the scheme operates as follows: Nova Health generates CGx samples by cold-calling Medicare beneficiaries and offering a "free" cancer screening test, to be paid for by Medicare. If the beneficiary consents to the tests, Bronson telemedicine providers falsely certify that the tests are medically necessary, even if the patient does not have cancer. MyTest then performs these medically unnecessary CGx tests, and submits fraudulent claims for reimbursement based on the false diagnosis codes.

68.     Relator Beverly Shirley discovered this scheme as a Medicare beneficiary targeted by Defendants.

A.    **Nova Telemarketers Generate CGx Samples By Cold-Calling Medicare
Patients and Offering a "Free" Cancer Screening Test.**

69.    Nova Health purchases or otherwise obtains lists of Medicare beneficiaries and
cold-calls them to offer a "free" hereditary cancer test to be paid for by Medicare.

70.    The Nova Health telemarketer asks the beneficiary (1) whether he or she has or
had cancer, the type of cancer, and the diagnosis date; and (2) whether anyone in the
beneficiary's family has or had cancer, the type of cancer, and the diagnosis date.  Nova Health
does not collect any other medical information.

71.    If the beneficiary reports having been diagnosed with cancer, he or she "qualifies"
for the free test.  Nova Health also "qualifies" the beneficiary for the test if two close family
members were diagnosed with cancer, even if the beneficiary has no personal history of the
disease.

72.    Nova Health plainly markets these tests as "screening" tests intended for patients
who do not have cancer.  For example, Nova's sample collection kit is called a "Genetic
Screening Kit" and the enclosed instruction video is titled "Genetic Screening Instructional
Video."  The results letter from MyTest informs the patient of his or her "CGx screening" results
and advises that "[t]aking preventative measures like the CGx screening is important."  The
results report itself is titled "Cancer Screening Test Results" and refers repeatedly to the test's
ability to detect "cancer risk" as opposed to the disease itself.

73.    Medicare does not reimburse for screening tests when the patient has only a
family history of cancer. The designated Medicare Administrative Contractor for Defendant
MyTest has explicitly noted that "screening services such as pre-symptomatic genetic tests and
services used to detect an undiagnosed disease or disease predisposition are not a benefit and are
not covered."  First Coast Service Options, Inc., Local Coverage Determination, Molecular

17

Pathology Procedures (L34519) (Jan. 1, 2019). Medicare will only reimburse CGx tests if the patient has a personal history of cancer.

74. Despite their promises to the contrary, Defendants therefore knew or should have known that these screening tests – for asymptomatic individuals with no personal history of cancer – are not recognized by Medicare as medically necessary, and are excluded from coverage by the Medicare statute.

75. Medicare beneficiaries are furthermore rewarded by Defendant Nova Health for consenting to these CGx tests. Sometime after agreeing to these CGx tests, for example, Relator was rewarded with two separate $10 Walmart gift cards.

### B. Defendants Falsely Represent that Patients have a Personal History of Cancer to Receive Medicare Reimbursement.

76. Relator received a solicitation call from Nova Health on or around March 1, 2019. She told the telemarketer that she did not have cancer but that one of her brothers was diagnosed with lymphoma and another with melanoma. The telemarketer said that she qualified for the CGx test and collected her personal information.

77. On Relator's requisition form, four ICD-10 codes were ultimately entered. Two codes indicated a family history of cancer (Z80.7, Z80.8). Two of the codes, however, falsely represented that Relator had Non-Hodgkin lymphoma (C85.90) and malignant melanoma of the skin (C43.9).

78. Without an ICD-10 code indicating a personal history of cancer, Medicare will not reimburse any CGx testing. If the patient denies having been diagnosed with cancer and reports only a family history of cancer, Defendants must add a false ICD-10 code indicating that the patient has cancer to receive Medicare reimbursement.

18

79.    Nova Health does not send requisition forms to patient before ordering the test, so a cancer-free patient will not know that Nova Health is falsely reporting to Medicare that he or she has cancer.  The patient, in fact, does not see or sign any documents before the test is conducted.

80.    On information and belief, CGx samples that Nova Health collects are for Medicare beneficiaries with no personal history of cancer, and Nova Health or a Bronson provider enters false ICD-10 codes.  By falsifying the requisition to include fraudulent ICD-10 codes, Nova Health and/or Bronson cause MyTest to submit false claims for reimbursement to Medicare.

### C.    Bronson Telemedicine Providers Falsely Certify That the CGx Tests Are Medically Necessary.

#### 1.    *Defendants' CGx tests were certified as "medically necessary" based on false diagnosis codes.*

81.    After filling out the CGx requisition, Nova Health sends the form to a Bronson telemedicine provider, who signs it, certifying that the test is medically necessary.

82.    In Relator's case, Koral Williams, a Bronson telemedicine nurse practitioner from Kansas City, falsely certified that Relator's CGx test was medically necessary despite knowing that Relator did not have cancer.  Williams wrote on the Insurance Verification Document that Relator was "an appropriate candidate for [the CGx test]" because "multiple family members have been diagnosed with cancer." Williams made no indication that Relator herself had cancer, nor would any evidence have supported such a conclusion.

83.    Williams also knew, or should have known, that Relator's lab requisition form – and therefore Medicare reimbursement claim – included two false ICD-10 codes indicating Relator had active cancer. These codes, indicating Relator had Non-Hodgkin lymphoma

(C85.90) and malignant melanoma of the skin (C43.9), could ultimately allow Defendant

MyTest to successfully claim reimbursements from Medicare.

> 2.  *Defendants' CGx tests were not ordered by a "treating physician," and therefore could not be "medically necessary" under Medicare rules.*

84.    Defendant's certifications were also false because medically necessary laboratory

tests must be ordered by a treating physician. A Bronson telemedicine provider does not qualify

as a treating physician under Medicare rules because the Bronson provider does not have a

legitimate clinical relationship with the patient, and does not intend to use the test to treat or

manage the patient's cancer.

85.    The only time the Bronson provider speaks to the patient is during the solicitation

call.  The Bronson provider does not access the patient's medical records or consult with the

patient's primary care physician or other treating physician.  If a patient receives a "positive" test

result, indicating the presence of a genetic mutation, the Bronson provider does not call the

patient, arrange treatment, or seek a referral to a cancer specialist.  The sole function of the

Bronson telemedicine provider is to order the CGx test.

86.    Bronson's telemedicine providers, such as Koral Williams, knew or should have

known that they are not a treating physician. While Williams noted on the Insurance Verification

Document that she spoke to Relator during the initial solicitation call, those notes reflect that

their conversation was limited to an explanation of the testing process.  This single, fleeting

conversation could not create a legitimate treatment relationship.  After ordering the test,

Williams never called Relator to discuss the results, and the two never spoke again.

87.    In fact, despite multiple attempts, Relator was unable to discuss her test results

with anyone.

20

88.     Relator first received her Medicare Summary notice, indicating the testing performed by, and Medicare reimbursements received by MyTest. Relator had not yet received her test results, so called a helpline number provided to testing patients, and asked for the results of her test. The woman who answered the phone did not offer to arrange a medical consultation, but, after consulting with a superior, she told Relator that she would send Relator's "diagnosis."

89.     A short time later, Relator received her "diagnosis," indicating no genetic mutations of clinical significance. Relator then received a copy of MyTest's Medicare appeal letter, where MyTest requested reimbursement of even more Medicare tests than the $4,605 originally approved.

90.     At this time, Relator learned from the appeal letter that Defendants had falsely claimed to Medicare that she had cancer. Relator also later received her MyTest "Cancer Genetics Requisition Form" and a Bronson "Insurance Verification Document." None of these documents helped her understand her results.

91.     On or around May 30, 2019, Relator received a phone call from what appeared to be Bronson, but the person she spoke to did not advise Relator about her test results or identify herself as a medical provider.  She said only that she was following up on Relator's inquiry and asked her to call 888-230-8455, the number Relator had first tried.

92.     Relator called again, reaching a man named Bruce who said that he worked for Nova Health. On this call, Bruce noted that that he did not understand the purpose of the call, as Relator had received the forms sent by MyTest.  During the call, Bruce again confirmed to Relator that she owed nothing for these tests.

93.     Relator never spoke to a physician or other medical provider, and never received any medical consultation regarding her test results.

### D.    MyTest Submits Fraudulent Claims for Reimbursement That Include False Diagnosis Codes.

94.    After the patient returns his or her genetic sample to Nova Health, Nova Health sends it to MyTest, along with the requisition.  Upon receiving the samples, MyTest references them out to Kailos Genetics, Inc., a genetics laboratory in Alabama, to run the test.  MyTest then submits a claim for reimbursement to First Coast, either through its own billing department or a third-party billing company.  These claims are fraudulent for two reasons.

95.    First, MyTest knowingly submits the false diagnosis codes to support the tests' medical necessity. Relator learned that MyTest had submitted false diagnosis codes for her CGx test after MyTest appealed the denial of several of its claims.  In a May 2, 2019, response to the appeal, First Coast confirmed that "the documentation received" from MyTest "indicates the molecular pathology testing was performed for the patient's condition of Non-Hodgkin lymphoma, unspecified (C85.90) family history other malignant neoplasms of lymphoid, hematopoietic and related tissues (Z80.7), Malignant melanoma of skin, unspecified (C43.9) and Family history of malignant neoplasm of other organs or systems (Z80.8)."

96.    For the portions of Relator's CGx testing that were approved, based upon these false diagnosis codes, MyTest received more than $4,500 in Medicare reimbursements.

97.    Specifically, MyTest received reimbursements for various levels of "molecular pathology" testing: testing that is specifically designed to help patients with active cancer develop more targeted drug treatment plans, or a better prognosis.

98.    Defendants' submission of false codes were material to the Government's decision to pay these Medicare claims. Molecular pathology tests are only covered if, among other conditions, "results of the testing … directly impact treatment or management of the

22

beneficiary," and would not be covered for a patient that did not have an active cancer ICD-10 code submitted with their labs.  Molecular Pathology Procedures (L34519).

99.     Second, MyTest knows or should know that the Bronson ordering provider  is not a treating physician.  The requisitions contain no patient medical history and are not accompanied by any medical records or treatment plan.  MyTest receives no evidence from Nova Health or Bronson that the telemedicine doctors ever speak to a patient more than once or intend to use the results to treat or manage the patient's disease.  As the laboratory billing Medicare for these CGx tests, MyTest is required to maintain the proper documentation to support medical necessity, including that the tests are ordered by a treating physician.  Based on the context in which these tests are ordered and the absence of any supporting documentation, MyTest knows that the Bronson telemedicine doctors do not have a legitimate clinical relationship with the patients and the tests are not medically necessary.

### E.     Defendants have Conspired to Submit False Claims to Medicare.

100.    Defendants have acted in conspiracy to defraud Medicare, using Defendant Nova's telemarketing services to target Medicare beneficiaries and generate test samples, Defendant Bronson's telemedicine operation to falsely certify medical necessity, and Defendant MyTest to submit reimbursement claims for unnecessary tests.

101.    On information and belief, Defendants have paid and/or accepted kickbacks to advance the scheme.

102.    On information and belief, MyTest pays Nova Health for obtaining the requisitions and CGx samples; MyTest and/or Nova Health pays Bronson to have its telemedicine providers certify the CGx tests as medically necessary; and Bronson pays its

telemedicine providers a fee for each patient consultation and/or CGx test order. Such payments would violate the AKS, rendering each claim false as a matter of law.

103.    Relator, through her daughter, reported her concerns regarding Defendants' conduct to the U.S. Department of Health & Human Services' Office of the Inspector General (HHS-OIG). Relator's OIG tip was confirmed on May 4, 2019.

**Count I**
**False Claims Act**
**31 U.S.C. §§ 3729(a)(1)(A)-(C) and (G)**

104.    Relator realleges and incorporates by reference the allegations contained in paragraphs 1 through 103 above as though fully set forth herein.

105.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

106.    By and through the acts described above, within the meaning of the False Claims Act, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A).

107.    Defendants submitted, or caused to be submitted, claims to the United States Government for CGx panel tests that were false (1) because the tests were medically unnecessary; (2) because the claims contained false diagnosis codes and claims for procedures that were never conducted; and/or (3) as a result of illegal kickbacks paid for each patient sample.

108.    By and through the acts described above, within the meaning of the False Claims Act, Defendants knowingly made or used, or caused to be made or used, false or fraudulent records or statements material to induce the Government to approve and pay such false or fraudulent claims, in violation of 31 U.S.C. § 3729(a)(1)(B).

109.    Defendants knowingly made or caused to be made false requisitions, bills, and requests for reimbursement for medically unnecessary tests that were material to the payment or approval of claims by federal programs.  Defendants also made or caused to be made false requisitions, bills, and requests for reimbursement for tests obtained by means of illegal kickbacks that were material to the payment or approval of claims by federal programs.

110.    The false records and statements submitted above were for the purpose of getting Government payment and were material in the Government's decision to approve payments of at least $4,000 to $6,500 for each CGx panel test.

111.    By and through the acts described above, within the meaning of the False Claims Act, Defendants knowingly conspired to commit violations of 31 U.S.C. § 3729(a)(1)(A), (B), and (G), in violation of 31 U.S.C. § 3729 (a)(1)(C), and took multiple steps individually and collectively to advance and execute the objectives of that conspiracy.

112.    Defendants conspired in the commission of false claims to cause the Government to pay more than $4,500 for each CGx tests that was medically unnecessary and the result of the payment of illegal kickbacks.  Nova Health knowingly collected patient samples, created requisitions for medically unnecessary tests, and falsified the ICD-10 diagnosis codes.  Bronson knowingly used telemedicine providers to order these tests and falsely certify them as medically necessary.  MyTest knowingly paid kickbacks for patient samples and medically unnecessary CGx tests and, through MyTest's billing department or a third-party company, knowingly submitted false claims for those tests to Medicare.

113.    By and through the acts described above, Defendant knowingly concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).

114.    Defendants knowingly submitted false claims to the Government requesting reimbursements for CGx tests that were medically unnecessary and obtained by illegal kickback payments, fraudulently causing the Government to make payments that Defendants were not entitled to.  At that time or after, Defendants knew or should have known that the claims were fraudulent and that they were not entitled to the fraudulently obtained Government funds. Defendants had an obligation to return the fraudulent payments/overpayments but instead ignored their duties, continually perpetuating the prior fraud.

115.    The Government, unaware of the falsity of the records, statements and claims made or caused to be made by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' illegal conduct.

116.    By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

117.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every violation alleged herein.

## VI.    **PRAYER**

WHEREFORE, Plaintiff prays for judgment against the Defendants as follows:

1.    That Defendants cease and desist from violating 31 U.S.C. § 3729 et seq.;

2.    That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of false claims submitted to Medicare and other Government programs, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, as adjusted by the Federal Civil Penalties Inflation Adjustment Act;

3.    That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

4.    That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5.    That the United States and Plaintiff-Relator recover such other and further relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated:  August 21, 2019

Respectfully submitted,

Jeffrey W. Dickstein
Florida Bar No. 434892
PHILLIPS & COHEN LLP
Southeast Financial Center
200 S Biscayne Boulevard
Suite 2790
Miami, FL 33131
Tel: 305-372-5200
jdickstein@phillipsandcohen.com

Amy L. Easton
Samuel E. Brown
PHILLIPS & COHEN LLP
2000 Massachusetts Avenue NW
Washington, DC 20036
Tel:  (202) 833-4567
Fax:  (202) 833-1815
aeaston@phillipsandcohen.com
sbrown@phillipsandcohen.com

Attorneys for *Qui Tam* Plaintiff Beverly Shirley

27